John C. HUNDAHL, Individually, Derivatively, as Class Representative, and as Co-Executor of the Estate of Ernest Hundahl, Deceased, Mark Hundahl, Individually, and as Class Representative

v.

UNITED BENEFIT LIFE INSURANCE COMPANY, Mutual of Omaha Insurance Company, V. J. Skutt, John D. Minton, Albert W. Randall, and Hugh V. Plunkett, Jr.

Civ. A. No. CA–3–77–1405–G.

United States District Court,
N. D. Texas,
Dallas Division.

Feb. 8, 1979.

**1352**

Mark A. Martin, John H. Marks, Jr., and Hal L. Sanders, Jr., Dallas, Tex., for plaintiffs.

James E. Coleman, Jr., Carrington, Coleman, Sloman, Johnson & Blumenthal, Dallas, Tex., for United Benefit Life Ins.; Donald F. Evans, United Benefit Life Ins. Co., Omaha, Neb., of counsel.

John L. Hauer and W. Michael Byrd, Jr., Akin, Gump, Hauer & Feld, Dallas, Tex., Bobby D. Dyess, Elliott, Churchill, Hansen, Dyess & Maxfield, Dallas, Tex., for Mutual of Omaha; Willis B. Snell, Francis M. Gregory, Jr. and James F. Jordan, Sutherland, Asbill & Brennan, Washington, D.C., Frank J. Barrett, Mutual of Omaha Ins. Co., Omaha, Neb., of counsel.

H. Robert Powell and William B. Finkelstein, Hughes, Luce, Hennessy, Smith & Castle, Dallas, Tex., for individual defendants.

## MEMORANDUM ORDER

PATRICK E. HIGGINBOTHAM, District Judge.

Broad judicial interpretation of the antifraud provisions of the federal securities laws has encouraged private parties to prosecute corporate disputes in federal courts. The breadth of this statutory construction has resulted from the way in which the courts have resolved certain unescapable policy questions. These questions, which arise whenever a court must explicate the judicially created rights of action under the securities laws, concern the nature of federalism and the proper role of the judiciary in the resolution of corporate disputes. Recent decisions of the Supreme Court signal a change in the policies and a retreat for the federal courts in securities regulation. The motion for partial summary judgment in this case requires this court to determine whether the pleadings and other documents submitted to this point raise substantial questions of fact that fall within these apparently contracting boundaries for federal judicial roles. It requires a judgment not only that a retrenchment has been plainly signaled, but also where today that moving line is "properly" drawn.

*Facts*

This action is brought by John C. Hundahl and Mark Hundahl, who assert individual, derivative, and class action claims. John C. Hundahl sues individually as a current shareholder of the United Benefit Life Insurance Company (United), derivatively on behalf of United, as representative of a class composed of all current minority shareholders of United, and, finally, as co-executor of the estate of Ernest Hundahl, deceased. Mark Hundahl sues individually and as representative of the class of persons who have sold shares of United stock since 1965. Named as defendants are the Mutual of Omaha Insurance Company (Mutual); Vestor J. Skutt (Skutt), chief executive officer and chairman of the board of directors of both Mutual and United; John D. Minton (Minton), president and chief operating officer of Mutual and a director of both Mutual and United; Albert\W. Randall (Randall), senior executive vice`president of Mutual and United and a director of United; Hugh V. Plunkett (Plunkett), vice chairman of Mutual's board of directors, a director of United and former chairman of the Mutual policyholders investment-executive committee, which is alleged to have engineered Mutual's October, 1977 tender offer for United stock; and, finally, United, which is a defendant for derivative purposes only.

The complaint sets forth a panoply of acts alleged to violate the antifraud provisions of the federal securities laws and the common law of Texas and asks for injunctive and monetary relief, and an accounting. Jurisdiction is founded on diversity of citizenship and on section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa (1976).

The defendants have moved for summary judgment with respect to all claims based on federal law[1] and have supplemented their motion with a substantial volume of documents and affidavits. Plaintiffs, in turn, have vigorously opposed the motion

for summary judgment, and have presented this court with an equally formidable array of documents. Before examining in greater detail the portions of the complaint and supporting documents pertinent to the disposition of this motion, the factual setting of the litigation must be outlined.

Mutual and United are both major insurance companies incorporated and headquartered in the State of Nebraska. United is a stockholder-owned life insurance company, while Mutual is a mutual legal reserve company engaged principally in the sale and underwriting of health and accident insurance. Mutual's present ownership of greater than 80% of the shares of United is the result of a series of purchases that date back nearly 30 years. As early as 1949, Mutual was urged by the National Association of Insurance Commissioners (NAIC) to acquire all outstanding shares of United in order to eliminate the continuing risk of conflict of interest inherent in the joint operation of the companies. Mutual's gradual acquisition of United stock, though, has been a long and difficult process, impeded in part by Nebraska laws that limited the amount of surplus Mutual could invest in another insurance company. The task of acquiring all United shares was made even more difficult by substantial increases in the value of United stock during the period in question. A number of plans for consolidation of the corporations were pondered, but none proved feasible.

By October 5, 1977, Mutual had managed to acquire, through a series of open-market purchases, approximately 71.49% of United stock. On that date Mutual announced an offer to buy from minority shareholders 8.51% of the shares of United. The tender offer expired on October 26, 1977, after Mutual had succeeded in its effort to attain an interest in United greater than 80%. This suit was filed on October 24, 1977.

---

1. Granting of the motion would have broad ramifications for the maintenance of this suit, because, while diversity of citizenship provides an independent jurisdictional support for the state law claims, summary judgment on the federal claims would deprive plaintiffs of the liberal provisions of the federal Act for service of process and would bring the $10,000 amount in controversy requirement of diversity jurisdiction into play.

The allegations made by the plaintiffs that relate to claims based on federal law focus primarily on Mutual's plan to acquire United stock and the methods employed to carry out that plan, and on the October, 1977 tender offer.

With regard to Mutual's acquisition plan, plaintiffs assert that Mutual and the individual defendants engaged in a complex series of actions aimed at artificially depressing the price of United shares to the end that Mutual might more easily acquire 100% ownership of United. The scheme allegedly consisted of the following elements: improper allocation to United of certain expenses that should have been borne by Mutual; improper restriction of dividends to United shareholders; creation of unnecessarily large United reserves for policy reevaluation and contingencies; use of grossly conservative accounting principles in the preparation of United's financial reports; and, finally, failure to disclose the foregoing acts as well as the true value of United's assets in United's financial reports. The plaintiffs claim that this alleged scheme to manipulate the price of United stock and the alleged misrepresentations in United's financial reports violate section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) (1976), and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1978), promulgated by the Securities Exchange Commission pursuant to that section.[2]

In support of their claim that the defendants' activities violated Rule 10b–5, the plaintiffs set forth in some detail pertinent elements of Mutual's management of United during the period of time covered by the complaint. The record shows, and the defendants do not dispute, that during that period Mutual showed a strong and continuous interest in the acquisition of United stock, and that Mutual implemented a number of managerial decisions that significantly affected the relationship between Mutual and United as well as United's corporate policies. There follows a brief outline of the relevant events.

The documents and affidavits submitted disclose a continuing effort by Mutual dating at least as far back as 1951 to acquire shares of United, as well as an awareness of the possible effect of United policies on the value of United stock. In 1951, for instance, Mutual sought from a Nebraska state court a declaratory judgment as to the legality of a proposed purchase of United shares. Mutual learned that at that time it could invest no more than 35% of its surplus in United stock. A 1953 report of the policyholders investment-executive committee of Mutual shows that at least as early as that date Mutual was aware of the possible effect upon Mutual's acquisition goals of United's dividend policies. During the years that followed, Mutual conducted, or directed outside experts to conduct studies to evaluate the stock of United. In 1961, a special subcommittee of the Mutual Investment Committee was appointed for the purpose of overseeing the acquisition of United stock. In 1962, a plan to merge the two companies was considered, but was found to be unfeasible.

Throughout this period, Mutual made substantial open-market purchases of United stock. In 1968, Mutual, fearing that disclosure of its purchasing efforts might raise the price of United stock, conducted its purchases through an intermediary. In 1976, Mutual obtained a number of fractional shares of United that resulted from a 25% stock dividend. Finally, at each annual meeting from 1970 through 1977, Mutual policyholders adopted a resolution authorizing the policyholders investment-executive committee to implement a program to acquire shares of United and other subsidiaries.

Also central to the plaintiffs' allegations is the history of allocation of joint expenses between Mutual and United. Between 1949

---

2. Liability of the individual defendants is premised on section 20(a) of the Act, 15 U.S.C. § 78t (1976), which provides that:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly or severally with and to the same extent as such controlled person . . . .

and 1962, expenses were allocated according to a formula proposed by Mutual's accountant, Arthur Andersen & Co. Under the formula, expenses were allocated on the basis of the relative benefits derived by each company, with the exception of agency force and advertising expenses, which were considered incapable of allocation and hence were borne by Mutual.

In 1960, however, Mutual undertook a reassessment of the allocation policy. Following lengthy discussion and despite substantial opposition from the United board of directors, a new plan was adopted in 1965 under which certain agency management expenses were divided equally between the companies.

In the years that followed, further significant changes in allocation policies were made. Between 1972 and 1974, the effect of the allocation formula was that United paid approximately 25% of advertising expenses. As a result of policy changes, however, United in 1975 paid approximately 49% of such expenses, and its 1975 advertising expenses were more than one million dollars greater than in 1974. In addition, substantial portions of the start-up expenses of three new subsidiaries of Mutual were allocated to United.

Plaintiffs point to United's dividend policy and reserve maintenance policy as additional elements of the alleged scheme to manipulate the price of United stock. The documents submitted indicate that at least some officers of Mutual felt that United's dividend was far below that paid by comparable companies. The plaintiffs allege that payment of unjustifiably low dividends and maintenance of extraordinary reserves by United were part of Mutual's scheme to paint a gloomy picture of United's financial condition and to depress artificially the price of its stock.

Finally, the plaintiffs point to Mutual's use of accounting procedures so grossly conservative as to be misleading in preparation of United's financial reports as another of Mutual's activities calculated to depress the price of United stock. In support of this claim, plaintiffs present a study conducted by Price Waterhouse and Company which concludes that assumptions used in the 1973 conversion of United's financial statements to reflect generally accepted accounting principles were "very conservative" and that "[n]et income and stockholders' equity of United included in such financial statements would have been greater under certain other assumptions which are still reasonably conservative as required by generally accepted accounting principles for stock life companies."

The allegations relating to the October, 1977 tender offer are premised on section 14(e) of the Act, 15 U.S.C. § 78n(e) (1976) and consist of claims that the defendants intentionally misled the persons to whom the offer was made by making false statements and by failing to state material facts in the offer. More specifically, plaintiffs claim that the following statements or omissions made the offer misleading: the statement that A. M. Best Co., following an "intensive review of the operating statements and results of United," had concluded that the $174 offered per share was a fair price; the statement that Best, in conducting its study, had compared United to other companies with similar characteristics; the statement that Mutual did not intend to effect a merger with United upon completion of the offer; failure to state that Mutual had breached its fiduciary duty to United by improperly handling United's dividends and reserves, and by improperly allocating inter-company expenses; failure to disclose the filing of this law suit (this suit was filed two days before the expiration of the tender offer, but plaintiffs claim that Mutual knew of the suit before it was filed); failure to disclose that other methods of valuing United's worth would have resulted in a substantially higher valuation of United shares than that determined by Best; improper emphasis of the statutory presentation of United's financial condition as opposed to a presentation based upon generally accepted accounting principles; inaccurate representation as to the value of United's home office; and, finally, failure to disclose the imminent adoption of a new

rate book that would result in substantially higher earnings for United. Again, a brief sketch of the facts underlying these claims is in order.

The valuation of United for purposes of the tender offer was performed by Burt Kellogg and the A. M. Best Company. The tender offer to United shareholders stated that the price of $174 per share was the result of "an intensive review of the operating statements and results of United Benefit, . . . after comparing those results with those of other stock life insurance companies that have reasonably similar characteristics." Plaintiffs claim, however, that the study performed by Kellogg and Best was inadequate, and one of plaintiffs' experts concluded that "Best's performed a superficial and incomplete job of analysis. The most important valuation factors . . were virtually ignored." Moreover, plaintiffs claim that Best adjusted its valuation to conform to the wishes of Mutual, and that Best was deliberately chosen with the knowledge that it would produce a low valuation. Finally, plaintiffs have introduced reports of its own experts ·which value United stock at between $348 and $500 per share.

With respect to the question of Mutual's purpose in making the tender offer, the offer itself states that "Offeror is making this Offer primarily for the purpose of . . qualifying Offeror for certain tax benefits . . . . As a result of the ownership of 80% of United Benefit's stock, Offeror will be entitled, though it has no present intention to do so, to effect a merger of United Benefit into another, wholly-owned subsidiary of Offeror upon terms by which minority stockholders of United Benefit could receive only cash." Plaintiffs claim that contrary to this statement, Mutual did in fact intend to effect a short-form merger of United with one of its subsidiaries, an intention that, according to plaintiffs, is evi-

denced by certain memoranda prepared by Mutual's legal counsel.

Plaintiffs further claim that the tender offer materials unlawfully failed to disclose the impending adoption by United of a new rate schedule that would result in significantly higher earnings. The new rate plan was in fact adopted by United's board of directors on October 25, 1977, one day before the expiration of the tender offer, and became effective on January 1, 1978. While defendants claim that this development was omitted from the tender offer because of uncertainty as to its approval, plaintiffs claim that its adoption was assured long before the tender offer was made.

In summary, plaintiffs claim that the defendants entered into a complex scheme to manipulate the price of United stock and that they intentionally and fraudulently misled the minority shareholders in the October, 1977 tender offer. Only a bare outline of the myriad facts and allegations that underlie those claims has been sketched here. The sole question for decision is whether the pleadings, affidavits, and documents submitted by the parties raise questions of fact that fall within the legal boundaries of the antifraud provisions of the federal securities laws.[3]

### The § 10(b) and Rule 10b–5 Claims

Defendants, arguing that the John Hundahl class lacks standing to sue and that both classes have merely alleged corporate misconduct and breaches of fiduciary duty, have moved this court to grant summary judgment on plaintiffs' claims under section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5. Section 10(b) states that it is unlawful for any persons to use "in connection with the purchase or sale of any security . . . any manipulative or deceptive device." Rule 10b–5 provides as follows:

---

**3.** In a sense, this motion is more closely akin to a motion to dismiss for failure to state a claim that a motion for summary judgment. Defendants at this juncture specifically deny few of plaintiffs' allegations; rather, they argue that the allegations made by plaintiffs and the docu-

ments submitted in support of those claims do not raise any issues that lie within the reach of the federal securities laws. Nonetheless, the defendants' motion is for summary judgment and summary judgment principles will be applied.

§ 240.10b–5 Employment of manipulative and deceptive devices.

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

If the John Hundahl class does not have standing, this court, of course, must grant defendants' motion and dismiss their action. Likewise, if plaintiffs' claim is only one of corporate mismanagement, it is not valid. If, however, they complain of and have demonstrated a fact question regarding conduct which can fairly be viewed as manipulative or deceptive within the meaning of section 10(b), then their claim will withstand defendants' summary judgment motion. *See Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 473–74, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

### Standing

Defendants contend that because the class of minority shareholders and their representative John Hundahl are neither purchasers nor sellers of securities, they do not have standing to sue for injunctive relief under Rule 10b–5. We agree that the class does not satisfy the purchaser/seller requirement; however, because they seek injunctive relief, they nonetheless have standing. Defendants' motion to dismiss the nonselling shareholders' class claims for lack of standing therefore is denied.

Plaintiffs argue that although the class members may not have actually sold any stock, they are in fact sellers within the Securities Exchange Act. Section 3(a)(14) defines the terms "sale" and "sell" to "include any contract to sell or otherwise dispose of" securities. Plaintiffs' analysis is as follows: a corporation's charter constitutes a contract between the corporation and its stockholders. The provisions of the state's corporation laws are a part of each corporation's charter. When the class members purchased their United stock, they implicitly agreed that if another corporation were to acquire a certain majority of United's outstanding stock, that corporation could cause a merger with United. Mutual, upon successful completion of its tender offer, owned more than 80% of United's outstanding stock and thus gained the right to effect such a short-form merger. *See* Art. 44–224.04, Nebraska Insurance Code; Art. 21–2073, Nebraska Business Corporation Act. Plaintiffs argue that they have uncovered considerable evidence of Mutual's intention to exercise its right to merge and the Mutual's manipulative conduct is in furtherance of this intention. They contend that under these facts the minority shareholders of United have standing as sellers to seek Rule 10b–5 injunctive relief. We reject plaintiffs' argument.

Plaintiffs place great emphasis on *Voege v. American Sumatra Tobacco Corp.*, 241 F.Supp. 369 (D.Del.1965). In that case the court adopted the same analysis which plaintiffs here propose. It concluded that because the manipulation alleged was related to such a vital part of the "contract" as the fixing of the purchase price, the plaintiffs had standing to sue.

For several reasons, we decline to apply *Voege* to this case. First, contrary to the plaintiffs' contention, the Fifth Circuit did not adopt the *Voege* analysis in *Dudley v. Southeastern Factor & Finance Corp.*, 446 F.2d 303 (5th Cir. 1971), *cert. denied, McDaniel v. Dudley*, 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971). Rather, the Circuit cited *Voege* for the much narrower proposition that a shareholder has standing "as a seller when the nature of his investment has been fundamentally changed from

an interest in a going enterprise into a right solely to a payment of money for his shares." A merger had actually occurred in *Voege* and plaintiffs had exercised their statutory right and demanded an appraisal. All that remained was for the appraisal to be conducted and the corporation to pay plaintiffs accordingly. In this case, however, the merger has not been consummated and its occurrence remains speculative. Thus, no such "fundamental change" in plaintiffs' investment has occurred. Second, after the district court decided *Voege*, the Supreme Court handed down its landmark decision, *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). In light of the Supreme Court's strong stance on the purchaser/seller requirement, we cannot apply *Voege* to a set of facts as attenuated as the one before us.

Plaintiffs contend that even though the merger has not transpired, the contract remains an option to buy and the class has standing to sue as parties to such an executory contract. They cite several cases for the proposition that parties to executory contracts have standing under Rule 10b–5. *See Davis v. Davis*, 526 F.2d 1286 (5th Cir. 1976); *Wulc v. Gulf & Western Industries*, 400 F.Supp. 99 (E.D.Pa.1975); *Collins v. Rukin*, 342 F.Supp. 1282 (D.Miss.1972). We do not dispute the proposition that parties to executory contracts have standing. We find only that no contract, executory or otherwise, exists sufficiently to confer standing under Rule 10b–5.

Plaintiffs suggest that because the relief they seek is injunctive, the standing rule is relaxed. We find this argument persuasive and hold that even though they are not purchasers or sellers, their status as shareholders confers on them standing to seek 10b–5 injunctive relief.

The rationale of *Blue Chip* supports our conclusion. First, the dangers of not requiring an actual purchase or sale of securities do not inhere in an action for injunctive relief as they do in an action for damages. *Blue Chip* was a suit for monetary damages. The court noted that a plaintiff who

neither purchases nor sells but seeks monetary relief for loss of a noncontractual opportunity to buy or sell seeks "a largely conjectural and speculative recovery in which the number of shares involved will depend on the plaintiff's subjective hypothesis." 421 U.S. at 734–35, 95 S.Ct. at 1925. The same specificity is not necessary in an action for injunctive relief. *Securities and Exchange Commission v. Capital Gains Research Bureau*, 375 U.S. 180, 183, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963); *Davis v. Davis, supra* at 1290. In *Davis v. Davis, supra*, the Fifth Circuit stated that the need for "a purchase or sale, which is easily documented both qualitatively and quantitatively, is not as critical in a suit for injunctive relief as it is where damages are sought." 526 F.2d at 1290.

Second, the Supreme Court in *Blue Chip* noted that absent a purchaser/seller requirement, plaintiff's entire proof would be dependent upon his uncorroborated oral testimony which is incapable of documentary verification. 421 U.S. at 746, 95 S.Ct. 1917. A nonpurchaser or nonseller seeking to establish monetary damages must establish that absent the misrepresentation, he would have sold or bought. Such "proof" is both speculative and virtually irrebuttable. "The virtue of the *Birnbaum* [*Birnbaum v. Newport Steel Corp.*, 2 Cir., 193 F.2d 461] rule, simply stated, in this situation, is that it limits the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates." *Id.* at 747, 95 S.Ct. at 1931. A plaintiff requesting injunctive relief must demonstrate that the continuation of past and present practices will injure him. His case thus will not hang on wholly subjective evidence. Furthermore, John Hundahl and the members of his class have all purchased United securities. Their status is easily documented.

Finally, in this case the danger of creating an infinitely broad class of plaintiffs whose claims, due to their uncorroborated oral proof, are virtually impossible to dispose of before trial does not exist. *See, id.* at 742–43, 95 S.Ct. at 917. The number of

individuals who have purchased United stock in the past and who today are minority shareholders is finite and their claims and status do not turn on oral testimony alone. Thus the danger that minority shareholders will bring vexatious litigation solely for its settlement value is no greater than the risk that actual purchasers or sellers will instigate such suits.

Several courts, following the implications of *Blue Chip*, have held that a plaintiff seeking only injunctive relief need not satisfy the strict standing requirement. The Third Circuit in *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 194 (3d Cir. 1976) assumed that "the relaxed standing rule . . . retains its vitality after *Blue Chip Stamps* in appropriate cases where only injunctive relief is sought to prevent incipient 10b–5 violations." The Second Circuit, originator of the purchaser/seller requirement, applied the relaxed standing rule in a suit for injunctive relief. *Mutual Shares Corp. v. Genesco, Inc.*, 384 F.2d 540 (2d Cir. 1967). Although *Genesco* was decided before *Blue Chip*, the Second Circuit had already adopted the purchaser/seller rule for monetary damages. The Fifth Circuit in *Davis v. Davis, supra*, cited *Genesco* with approval and quoted from the case at length. 526 F.2d at 1289–90. We find these precedents persuasive and hold that plaintiffs John Hundahl and the class of minority shareholders have standing to seek injunctive relief.

### Manipulation

■ The heart of plaintiffs' 10b–5 claim is manipulation. In *Santa Fe Industries, Inc. v. Green, supra*, the Supreme Court defined manipulation as "practices . . intended to mislead investors by artificially affecting market activity." 430 U.S. at 476, 97 S.Ct. at 1302. It held that a complaint based on mere corporate misconduct, the essence of which "is that shareholders were treated unfairly by a fiduciary" does not allege manipulation under Rule 10b–5. The Court cited as examples of manipulation wash sales, matched orders, and rigged prices. What it did not address was wheth-

er the term "manipulative" applies to the broad range of activities falling between those two extremes of mere corporate misconduct which has the incidental effect of raising or lowering prices and conduct in the marketplace which interferes directly with market machinery. Plaintiffs contend that any breach of fiduciary duty coupled with the intent to affect market prices, conduct which concededly falls within this gray area, constitutes manipulation within the *Santa Fe* definition. The defendants argue that intent is insufficient. Rather they suggest that under *Santa Fe* only activities in the marketplace can constitute manipulation. The issue which this court must resolve is whether the Supreme Court's definition of manipulation in *Santa Fe* encompasses acts occurring outside the marketplace which, absent an intent to manipulate, would constitute only a breach of fiduciary duty. We find that it does not.

In *Santa Fe*, the Supreme Court emphasized that "a private cause of action under the antifraud provision of the Securities Exchange Act should not be implied where it is "unnecessary to ensure the fulfillment of Congress' purposes." 430 U.S. at 477, 97 S.Ct. at 1303, *quoting, Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, at 41, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). The Court stated that the fundamental purpose of the Securities Exchange Act is the implementation of "a philosophy of full disclosure" to ensure a free market. *Id.* at 477, 97 S.Ct. 1292. This purpose is not a new judicial concept. Rather, it was the guiding principle behind many common law decisions and a moving force in 1934 in the passage of the Act. At common law, before any special securities legislation was enacted, courts honored the precept that the proper functioning of a securities exchange depends on the freedom of its market. *See* 3 L. Loss, Securities Regulation, p. 1531. Judge Woolsey, in *United States v. Brown*, clearly articulated the free market concept:

> When an outsider, a member of the public, reads the price quotations of a stock listed on an exchange, he is justified in supposing that the quoted stock is an appraisal of the value of the stock due to

a series of actual sales between various persons dealing at arm's length in a free and open market on the exchange, and so represents a true chancering of the market value of that stock thereon under the process of attrition due to supply operating against demand. 5 F.Supp. 81, 85 (S.D.N.Y.1933), *aff'd on other grounds,* 79 F.2d 321 (2d Cir. 1935), *cert. denied sub nom. McCarthy v. United States,* 296 U.S. 650, 56 S.Ct. 309, 80 L.Ed. 462.

The Senate Report on the Securities Exchange Act of 1934 reveals that Congress' purpose, like that of the courts at common law, was to protect investors by preserving the free market. The Report states that "excessive speculation" by those deprived of complete information, coupled with "unfair methods of speculation" indulged in by those in a position to control artificially the market price of stock were important causes of the crash of 1929 and the depression, and are the "principal problems with which the [Act] deals." S. Rep. No. 792, 73D Cong. 2d Sess. 3–5 (1934).

 To state a claim for manipulation under section § 10(b), the plaintiff must at the very least complain of conduct that interferes with the proper functioning of the free market. A free market is one in which investors are provided with sufficient information to enable them to assess accurately the value of a security. But conduct that interferes with the free market only by depriving it of complete information is not necessarily manipulative. When a corporation files a false report, or its director issues a misleading press release, or its officer sells stock based on inside information, the price of the security may have been changed and the securities laws may have been violated—but the conduct alone is not manipulative. The Supreme Court in *Santa Fe* explained that manipulative conduct consists of "practices . . . intended to mislead investors by artificially affecting

market activity." 430 U.S. at 476, 97 S.Ct. at 1302. In determining what the Supreme Court meant by this definition, this court has viewed the free market concept against the common law of manipulation, the language and legislative history of the Securities Exchange Act, and the Supreme Court's recent emphasis in securities cases on federalism. From this study, the following definition emerges: practices in the marketplace which have the effect of either creating the false impression that certain market activity is occurring when in fact such activity is unrelated to actual supply and demand or tampering with the price itself are manipulative.

Because of the paucity of recent caselaw, and because courts deciding common law manipulation cases were guided by the principle of the free market, the common law cases shed some light on the scope of the term "manipulation." Indeed, one leading commentator has written that the Securities Exchange Act did not modify the common law concept of manipulation, but incorporated it. *See* 3 L. Loss, *supra,* p. 1530.[4] At common law, courts prohibited as manipulative schemes that interfered with the free market mechanism. Those schemes invariably involved transactions in the marketplace, the effects of which were to prevent the market price from accurately reflecting the market's unimpeded judgment of the stock's value. In *United States v. Brown, supra,* the court held that a scheme involving touts, wash sales, and false statements "for the purpose of manipulating the market in stock . . . so as to artificially advance and inflate the price thereof without regard to the real value . . . ." was illegal. 79 F.2d at 323. *See Harris v. United States,* 48 F.2d 771 (9th Cir. 1931); *Rex v. De Berenger,* 3 Maule & S. 67, 105 Eng. Reprint 536 (K.B. 1814). Courts also refused to enforce contracts between manipulators involving market transactions to

4. Professor Loss in his treatise discusses the common law of manipulation in some detail. 3 L. Loss, *supra,* pp. 1530–40. He cites a number of cases which involve transactions in the marketplace coupled with false statements. These cases fit more properly under the section 10(b) category of "deception" rather than "manipulation." *See, e. g., Rex v. De Berenger,* 3 Maule & S. 67, 105 Eng. Reprint 536 (K.B. 1814). The significant point of these decisions is that conduct which interfered with the free market was prohibited.

affect price artificially. In *Sampson v. Shaw*, 101 Mass. 145 (1809), the court rescinded a "corner" contract, that is, a contract for the purchase of more than the available supply of securities with the intent of forcing short sellers to settle. Similarly, courts refused to enforce contracts for the touting of securities, *see, e. g., Ridgely v. Keene*, 134 App.Div. 647, 119 N.Y.S. 451 (2d Dept. 1909), and contracts to effect fictitious transactions. *Livermore v. Bushnell*, 5 Hun. 285 (N.Y.App. Div. 1st Dept. 1875). *See* 3 L. Loss, *supra*, pp. 1533–34, 1538–39.

▮ An examination of the Securities Exchange Act itself does not support the position that Congress intended to expand the term "manipulative" beyond the common law view rather than limit it to certain activities in the marketplace that interfere with the market's proper functioning. The Supreme Court in *Santa Fe* cited section 9 of the Act as providing examples of manipulation. 430 U.S. at 476, 97 S.Ct. 1292. That section, entitled "Manipulation of Security Prices," prohibits a number of manipulative devices that Congress found "serve no legitimate function." S. Rep. No. 792, *supra*, p. 7. In *Santa Fe*, the court pointed to three of those devices as examples of section 10(b) manipulation—specifically, rigged prices, fictitious or "wash" sales, and matched orders or orders for the purchase and sale of the same security from a common source for the purpose of creating an inaccurate picture of market activity. Section 9 also bars persons intimately involved in the workings of the marketplace—brokers, dealers, and persons who sell, buy, or offer to sell or buy a security registered on a national exchange—from disseminating false information and tipster sheets, and from employing another person to tout a stock.[5] Certain other devices, specifically, options, pegging, fixing, and stabilizing a stock because of their possibly legitimate

use, were not absolutely prohibited in section 9, but were left with the Securities Exchange Commission for regulation. Because all section 9 devices have the effect of misinforming investors by creating the false impression that certain market activity is occurring when in fact such activity is unrelated to actual supply and demand, it bolsters this court's definition of section 10(b) manipulation.

Legislative history supports the even narrower view that the manipulative conduct prohibited in section 10(b) is limited to the devices which section 9 bars. Because, as discussed *infra*, plaintiffs do not come within this opinion's definition of manipulation, this court need not determined whether the scope of section 10(b) manipulation cannot exceed that of section 9. The legislative history discussed below, however, does lend credence to the view that section 10(b) manipulation is not as broad as plaintiffs contend.

The Senate Report states that Congress intended the over-the-counter markets to be subject to the same stringency of regulation as the organized securities markets. S. Rep. No. 792, *supra*. The Report explains that the Act separated the two types of markets because "the necessity for regulation of 'over-the-counter' markets will depend largely on the extent to which activities prohibited on exchanges are transferred to such markets." *Id*. Instead of legislating where there was, as yet, no need to do so, the Congress decided to make provision for the regulation of over-the-counter securities "as flexible as possible." *Id*. Thus section 9 applies only to securities listed on national exchanges, but section 10 does not distinguish between listed securities and those traded over-the-counter. Section 10 is obviously devoid of the specificity that characterizes section 9. Because Congress directly stated its intent to

---

**5.** Plaintiffs contend that section 9(a)(4) prohibits precisely the type of conduct of which they here complain. Because the Court cites section 9 as examples of manipulation in *Santa Fe*, plaintiffs argue that they allege manipulation within the meaning of Rule 10b–5. They misread section 9(a)(4). That section does prohibit

the knowing dissemination of false or misleading material information concerning a security. It only applies, however, to a situation in which the defendant is involved directly and intimately in the functioning of the market. *See Robbins v. Banner Industries, Inc.*, 285 F.Supp. 758 (D.C.N.Y.1966).

achieve a parity of regulatory stringency, if not sameness in method, this lack of specificity does not support an inference that Congress thereby intended greater restrictions on over-the-counter stock by others. Rather, it was Congress' intent that the SEC should have the power to adopt such regulations as would place the stocks traded in over-the-counter markets on the same footing as those traded on national exchanges. *Id.* Thus the scope of manipulation in section 9 sheds light on its scope under section 10(b).

Further support for this view can be found elsewhere in the Senate Report. In the section of the report labeled "Manipulation Practices," those manipulative devices which the Act prohibits are set forth. *Id.* at 7–8. Although this portion of the Report does not mention any particular sections of the Act, it identifies only those devices which sections 9 and 16 by their terms specifically prohibit or regulate. In another portion of the Report, however, sections 9, 10, and 16 are identified as the parts of the Act dealing with manipulation. *Id.* at 6. One can thus infer that section 10(b)'s ban on manipulation must be read against the conduct specified in the other anti-manipulation sections.[6]

■ Finally, the Supreme Court's emphasis on federalism supports this court's definition of manipulation. The court in *Santa Fe* stated its reluctance to imply a federal cause of action for a claim "traditionally relegated to state law." *Santa Fe Industries, Inc. v. Green*, 430 U.S. at 478, 97 S.Ct. 1292. This concern with limiting the scope of the securities laws so as not to intrude on the province of the states is not new, but has appeared in a number of securities decisions. *See, e. g., Piper v. Chris-Craft Industries, Inc., supra*, 430 U.S. at 40, 97 S.Ct. 926; *Cort v. Ash*, 422 U.S. 66, 84, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). Of course market manipulation is hardly a claim "traditionally relegated to state law," but plain-

tiffs here to not complain that defendants conducted transactions in the marketplace which had the effect artificially of lowering the stock's price. Rather, they complain of acts which resulted in the market forming a judgment about the value of United stock based on its perception of the wisdom of decisions made by United's management. Such a judgment considered whatever was disclosed about the dividend policy, the allocation method the expenses, and the surplus. The mere fact that the market reacted to them by price changes does not make the acts manipulative. Indeed, a rise or fall in a stock price as a result of such acts is indicative of a free market process. Thus the acts of which plaintiffs complain are properly the subject of suits "traditionally relegated to state law," for if proved they are classic breaches of fiduciary duty. A failure to disclose them is arguably deception, but it does not constitute manipulation.[7] This construction of manipulation is not as restrictive as it might first seem. Few efforts to play with the price of a traded stock can be successful without running afoul of section 10(b)'s other weapon— deception. This construction leaves open only conduct outside the market but disclosed to traders in the market. To draw manipulation more expansively pulls pure breaches of fiduciary duty such as a restrictive dividend policy into the federal stream. It does so although that breach is traditionally redressable under state law. Thus this court's definition is an *a fortiori* result of *Santa Fe*.

Closely related o the Supreme Court's concern with federalism is its concern with the "inexorably broadening of the class of plaintiffs" under Rule 10b–5 and its perception that this has a major effect on supposedly increasingly unmanageable federal dockets. *See Blue Chip Stamps v. Manor Drug Stores, supra*, 421 U.S. at 747, 95 S.Ct. 1917. The court, by imposing strict require-

---

6. The report here seems to use "unfair speculation" interchangeably with "manipulation." As a result, it refers to section 16 as an antimanipulation section, when it is more properly viewed as an unfair speculation section.

7. We address plaintiffs' deception complaints in the following section.

ments concerning standing, defendants' intent, and the nature of defendants' acts, has steadily curtailed the scope of section 10(b) and Rule 10b–5. *See Santa Fe Industries, Inc. v. Green, supra; Ernst and Ernst v. Hochfelder, infra; Blue Chip Stamps v. Manor Drug Stores, supra.* It has manifested a marked reluctance to imply a private right of action under the securities laws when in its view such implication is not necessary to further their primary purpose—the achievement of an unimpeded market, functioning with full disclosure. *Santa Fe Industries, Inc. v. Green, supra,* 430 U.S. at 481, 97 S.Ct. 1292. The Supreme Court has not recognized a cause of action to serve "what is at best a subsidiary purpose" of the Act, the prevention of unfairness to shareholders. *Id.* at 478, 97 S.Ct. 1292. In permitting plaintiffs' complaint to stand, this court would be allowing what is actually an action for corporate unfairness, set apart from comparable state law claims only by an allegation that the breaches of duty were coupled with manipulative intent. The decision to disallow such a claim is at its root one of policy grounded in federalism; such a choice ultimately ought to be made by the Supreme Court. The Supreme Court made the choice in *Santa Fe.* Any quarrel of this court with that decision is irrelevant. Nor would it be intellectually honest to attempt to steer in a direction opposite that in which the Supreme Court has pointed.

Additionally, the precedential force of a holding that an allegation of corporate mismanagement coupled with manipulative intent states a claim under Rule 10b–5 would offend the Supreme Court's policy announced in *Blue Chip Stamps v. Manor Drugs, supra,* of preventing vexatious litigation. In that case the Court adopted the *Birnbaum* standing rule, requiring a 10b–5 plaintiff to be either a purchaser or seller of a security. Justice Rehnquist explained that a contrary holding would invite such vexatious suits, brought for their settle-

ment value alone. Even an unmeritorious claim, because of the time its defense would consume, the extensive discovery to which the corporate defendant would be subject, and the difficulty of disposing of most such cases before trial would force *in terrorem* settlements.[8] To gain access to the federal courts, a plaintiff with only a state law claim of corporate mismanagement would merely have to allege manipulative intent. *Santa Fe* would thus be undermined. Because intent is inherently a fact issue, summary judgment would rarely be appropriate; such claims would only be eliminated by trial or by settlement.

Finally, this court rejects plaintiffs' argument that precedent reaffirmed by citation in *Santa Fe* establishes that a scheme of the sort they allege constitutes a 10b–5 violation. They misinterpret these cases. The Court in *Santa Fe* cited *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) as an example of a case involving deception, not manipulation. 430 U.S. at 475, n. 15, 97 S.Ct. 1292. Justice White cited *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374 (2d Cir. 1974, cert. denied, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975) as another illustration of a case involving elements of deception. 430 U.S. at 475, n. 15, 97 S.Ct. 1292. Plaintiffs are correct in arguing that the *Schlick* scheme was in many ways similar to the one alleged here. In *Schlick,* however, the complaint alleged a *plan* whereby Penn-Dixie caused its subsidiary's pension fund to buy Penn-Dixie shares on the market in order to inflate the price of those shares. Such conduct falls squarely within this court's definition of manipulation. The actions occurred in the marketplace and constituted artificial acts of stimulative trading designed to mislead investors into believing that there was a heavy market demand for Penn-Dixie stock. Plaintiffs in this case allege no such manipulative conduct.

---

8. This suit is hardly of the strike variety. The plaintiffs are substantial shareholders. They are represented by distinguished and able counsel. It is the precedential force of the rule that is here addressed. This case points up the hazards of categorizing claims for breaches of the securities laws as "vexatious strikesuit". *Some are but many are not.*

### Deception

The less emphasized part of plaintiffs' 10b-5 claim is grounded on allegations of deception. They contend that defendants made certain misstatements or omissions of material fact for which Rule 10b-5 affords them relief. Defendants reply that these allegations merely amount to claims that defendants failed to condemn their own acts of corporate mismanagement and thus do not state a valid 10b-5 claim.

■ Rule 10b-5 was designed to impose a duty to disclose and inform, not a duty to become enmeshed in labeling disclosed information. *Golub v. PPD Corp.*, 576 F.2d 759 (8th Cir. 1978); *Popkin v. Bishop*, 464 F.2d 714 (2d Cir. 1972). The line between informing and labeling, however, is often not easy to draw. Courts have made clear that a party cannot bootstrap its way into federal court by alleging violations of state law and then claiming that the defendant failed to so label those violations. *Golub v. PPD Corp., supra; Goldberger v. Baker*, 442 F.Supp. 659 (S.D.N.Y.1977). In *Goldberger v. Baker, supra,* the plaintiff acknowledged that the terms of certain loans and a leaseback transaction were revealed, but accused defendant of not disclosing that the loans were for inadequate consideration and that the leaseback arrangement would damage the corporation. The court, dismissing the plaintiff's complaint, stated that a defendant could not be liable under 10b-5 merely for failing to draw certain negative conclusions or make derogatory predictions.

■ Certain of Hundahl's claims fall under this interdiction. Specifically, the allegations in Paragraph XII that defendants did not disclose their breaches of fiduciary duty and in Paragraph XIV that defendants did not reveal their mismanagement or their scheme, are dismissed. Paragraph XIII is equally clear. Plaintiffs allege that United's Annual Reports and Annual Financial Statements "failed to disclose the true surplus and did not accurately reflect the true worth of United," did not disclose the fact that the intercompany expense allocations were detrimental to United and did not reflect the actual expenses of the two companies. Paragraph XIII seeks to impose on defendants the duty either to state affirmatively that expense allocations were made to United's detriment or to pass judgment on whether the reports and statements revealed United's true value; it does not support a 10b-5 cause of action.

■ The other alleged acts of deception present more difficult problems. The plaintiffs have skillfully extracted from a complex set of facts a series of acts by Mutual management that they claim were deceptive in such a way as to fall within the reach of Rule 10b-5. Viewed separately, none of the alleged acts amounts to an affirmative misstatement; rather, the bare facts disclosed are true, and the claim is that there was not *enough* information given by Mutual to make the facts disclosed meaningful and, hence, not deceptive. But the omissions are not facts. They are instead nondisclosures of purpose and motive; for example, not disclosing that the true worth of the company stock was depressed by the accounting methods used. In a narrow sense, then, the essence of the plaintiffs' complaint is that Mutual did not adequately explain, or label, the elemental facts that it disclosed.

Plaintiffs rely on the following as deceptions:

1. Mutual was in possession of but failed to disclose material information regarding the extent to which allocation changes dictated by Mutual concealed United's profitability.

2. Mutual failed to disclose the degree to which United's "very conservative" book value conversions understated United's worth and earnings.

3. Mutual failed to explain the fact that Arthur Andersen & Co. felt an adverse opinion should have been issued regarding whether the 1973 financial statement fairly reflected GAAP.

4. Mutual failed to explain that it frequently changed Arthur Andersen decisions involving United's accounting without first informing United of Arthur Andersen's original position.

5. Mutual failed to explain that the market price at which United stock was selling was artificially low and not indicative of its true intrinsic value.

6. Mutual failed to disclose that United's assets had appreciated to an amount substantially in excess of their book value.

Only the third of these claims points to misstated or nondisclosed facts. All others seek a disclosure of management's motive; plaintiffs' allegation as to these would require management to label its decisions. These claims are not cognizable under federal law. Nor can the third allegation support a claim for relief, because, as plaintiffs admit, Arthur Andersen did ultimately approve . the 1973 financial statement, and could not have issued an adverse opinion.

■ There ·are, however, more specific allegations. First, during 1965–1977, defendants continued to refer to restrictions on dividend declarations stemming from an NAIC recommendation made in 1954 and 1955 but never formally rescinded. Plaintiffs urge that after 1965, if requested by management to do so, the restriction would have been lifted by the Nebraska Director of Insurance. Defendants admitted that this was probably true. It does not follow that defendants could stop disclosing the fact of the restriction. That omission could indeed have created liability under Rule 10b–5. The more narrow issue is whether Rule 10b–5 required defendants to accompany the revelation of the dividend restriction with a statement that management did not regard the restriction as a "true bar to its decision with regard to dividend declaration." The question is close because it is arguable that the gist of the claim is that management failed to request a lifting of the dividend restriction and in that sense, it is more a matter of mismanagement than of nondisclosure. But at this juncture there appears to be a fact question and it cannot be said as a matter of law that this claim does not fall within the reach of federal law.

Second, plaintiffs point to nondisclosure of how Mutual's allocation changes "concealed" United's profitability and hurt United's stock price in that the "true intrinsic value" of the stock was not revealed. Defendants have argued that this attack " . . . self evidently calls for characterizations of breaches of fiduciary duty . . .." We agree.

Therefore, viewed individually, only one of the acts alleged by plaintiffs as deceptive is cognizable under federal law. The analysis must now proceed to another level, however, for while the separate claims viewed in isolation may not amount to such nondisclosure as is within the reach of federal law, certainly there may be a point where the facts disclosed by corporate management, though true, are so devoid of explication or other supporting data that the overall disclosure becomes deceptive, and a claim is stated under the federal securities law. The line between nondisclosures that amount only, at most, to mismanagement and nondisclosures so significant that they constitute deception actionable under Rule 10b–5 cannot be drawn with precision. To be sure, there is a measure of arbitrariness in drawing it, for the factors that must be considered in making the determination are not quantitatively measurable. What is clear is that the sweep of federal law has been drawn tighter by the decisions in *Santa Fe* and other recent cases. Just how tight the string has been drawn is uncertain, and, at least until the Supreme Court again addresses the question, the lower courts must attempt to fashion a useful way to approach such questions.

■ Wherever the boundary of the federal court's role in this area is ultimately drawn, however, this case is likely to fall either near it or directly on it. Certainly the complaint here, while it is composed essentially of acts of mismanagement, paints an overall picture that is at least very close to the type of deception contemplated by Rule 10b–5. But in these circumstances, where the language of recent Supreme Court decisions provide little specific guidance, this court is constrained to follow the tone of those decisions. From *Santa Fe* must come the notion that where as here the central thrust of a claim or series of

claims arises from acts of corporate mismanagement, the claims are not cognizable under federal law. To hold otherwise would be to eviscerate the obvious purpose of the *Santa Fe* decision, and to permit evasion of that decision by artful legal draftsmanship. The plaintiffs here have, with undeniable skill, woven a complex series of acts of mismanagement into a fabric that appears to reflect a scheme of corporate deception. Yet the fabric is nonetheless woven from the thread of corporate mismanagement. For that reason, this court is constrained to follow the flow of recent Supreme Court decisions in the area of securities regulation and to resolve this difficult legal question in favor of the defendants. The claims under Rule 10b–5 are dismissed except the claim with regard to dividend restriction.

### The Section 14(e) Claim

Section 14(e) of the Securities Exchange Act, 15 U.S.C. § 78n(e) (1976), was enacted in 1968 as part of the Williams Act, an amendment to the Securities Exchange Act providing for pervasive federal regulation of tender offers. Section 14(e) is a somewhat unique case of a statute patterned after a regulation; it tracks in large measure the language Rule 10b–5. It provides as follows:

> (e) It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. . . .

The defendants' challenge to the maintenance of this suit under section 14(e) is

based primarily upon the nature of the plaintiffs who assert the claim. The claim is asserted by current shareholders of United, none of whom tendered shares pursuant to Mutual's offer.[9] Yet these plaintiffs argue that Mutual violated section 14(e) by overstating the attractiveness of its offer. It follows, then, that the members of the putative class of plaintiffs were not duped into tendering shares by the alleged misrepresentations in the tender offer. Consequently, the defendants argue, these plaintiffs may not assert a claim for damages under section 14(e).

The defendants' precise argument is that, even if in some cases a 14(e) claim for nontenderers might be appropriate, it is inappropriate here because these plaintiffs did not rely on the alleged misrepresentations and nondisclosures. Plaintiffs respond that a person asserting a claim under the section need not show reliance; rather, such a plaintiff need only show injury caused by the unlawful acts. Plaintiffs contend that they suffered injury as a direct result of the alleged violations of section 14(e), in that those violations led to successful completion of the offer, giving Mutual ownership of greater than 80% of United stock, a result that has significantly reduced the value and marketability of their United shares.

The arguments raise difficult questions concerning the as yet imprecisely defined limits of a claim under section 14(e), and they require this court to consider fundamental questions as to the scope and purpose of the Williams Act.

### Does Section 14(e) Create a Right of Action for Nontendering Shareholders Who Did Not Rely on the Alleged Misrepresentations?

▇▇▇ To begin with, it is important to consider whether section 14(e) can be the basis for a claim for damages by any private party, whether tenderer or nontender-

---

**9.** There is pending before this court a motion by Geraldine Moline to intervene in this action on behalf of all persons who tendered shares of United to Mutual pursuant to the tender offer.

That motion will be decided following disposition of the motion for summary judgment and will not be considered in this discussion.

er. While the Supreme Court specifically reserved comment on the question in *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 42, n. 28, 97 S.Ct. 926, 51 L.Ed.2d 124 (1976), the lower federal courts have consistently held that section 14(e) may be the basis for a private claim. In *Sargent v. Genesco, Inc.*, 492 F.2d 750 (5th Cir. 1974), the court wrote that "[a]lthough section 14(e) does not expressly provide for a private right of action, courts have uniformly implied one." The conclusion is a sound one in light of the same considerations that led the Supreme Court to find a private remedy under the proxy rules in *J. I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), and in light of the fact that section 14(e) tracks in large measure the language of Rule 10b–5 and was enacted at a time when Congress was fully aware that the courts had long been entertaining private damage suits under the rule.

Furthermore, the reasoning of the *Chris-Craft* decision does not preclude implication of a private action for damages under section 14(e) on behalf of a target company shareholder. As the Court in *Chris-Craft* emphasized, the legislative history of the Williams Act indicates that the Act was designed for the "especial" protection of shareholders.

> The legislative history thus shows that Congress was intent upon regulating takeover bidders, theretofore operating covertly, in order to protect shareholders of target companies. 430 U.S. at 28, 97 S.Ct. at 942.

Further inquiry into the legislative history by the court in *Chris-Craft* revealed that another goal of the drafters of the Act was "to avoid tipping the scales either in favor of management or in favor of the person making the takeover bid[s]," *id.* at 31, 97 S.Ct. at 944, *quoting* from 113 Cong.Rec. 24664 (1967), and to avoid discouraging the making of tender offers by threatening potential offerors with the spectre of enormous financial liability. But a private shareholder remedy for damages under section 14(e) would do far less to "tip the scales" or to discourage tender offers than would the creation of a remedy on behalf of tender offerors, the result rejected in *Chris-Craft*, where the Second Circuit had awarded $36 million in damages. Moreover, monetary relief awarded to target company shareholders would in general redound to the benefit of the shareholders for whose protection the Williams Act was designed, unlike *Chris-Craft* had recovery there been permitted under section 14(e).

Finally, and perhaps most importantly, creation of a private damages remedy on behalf of target company shareholders is necessary to effectuate the purposes of the Williams Act, at least absent more widespread SEC involvement in the early stages of takeover activity. As one commentator has pointed out, the "questionable status of attorneys' fees in such cases" makes injunctive relief an unsatisfactory vehicle for enforcing the Act, and, coupled with "the recent retrenchment in the area of class actions, the failure to recognize implied rights of action for damages on the part of aggrieved target company shareholders could render the protections of the Williams Act a 'snare and a delusion.'" Pitt, *Standing to Sue Under the Williams Act*, 34 Bus.L. 117 (1978). In sum, *Chris-Craft does not preclude creation of a private damages remedy under section 14(e) on behalf of target company shareholders, and the creation of such a remedy is a reasonably necessary means of effectuating the purposes of the Williams Act.*

The remedy, moreover, should extend to nontendering as well as tendering shareholders. Indeed, before *Chris-Craft*, the private remedy under section 14(e) had generally been held to extend to persons who were confronted with a tender offer but did not accept it as a result of misrepresentations by the offeror or by the target company.[10] One year after the statute was enacted, the Second Circuit in *Electronic*

---

10. This question, too, was raised but not answered by the Supreme Court in *Piper*, 430 U.S. at 38, 97 S.Ct. 926.

*Specialty Co. v. International Controls Corp.*, 409 F.2d 937 (2d Cir. 1969), a suit for an injunction, held that a nontendering stockholder had standing to sue for violations of 14(e).

> While a nontenderer suffers no immediate injury from inadequacy of price in the sense that he retains his stock, such inadequacy is likely to have a depressing effect on the market for some time and thus may hurt him if, for one reason or another, he should later find it necessary or desirable to sell. 409 F.2d at 946.

In *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579 (5th Cir.), *cert. denied* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974), the Fifth Circuit reached a similar conclusion:

> To charge violations of Section 14(e) in federal court a private plaintiff need not be a purchaser or seller of any securities, as he must be to sue under Rule 10b–5. This is the primary contribution of the Williams Act to the antifraud arsenal; under Section 14(e) a plaintiff may gain standing if he has been injured by fraudulent activities of others perpetrated in connection with a tender offer, whether or not he has tendered his shares. 489 F.2d at 596.

Other courts have reached the same result, *see, e. g., Hurwitz v. Jones Corporation*, 76 F.R.D. 149 (W.D.Mo.1977), and the result is sound, though not entirely without dispute. Nor is the force of these decisions permitting a nontendering stockholder standing under 14(e) significantly diminished by recent Supreme Court decisions narrowing the scope of actions under Rule 10b–5. Section 14(e) does not contain the purchaser-seller requirement of Rule 10b–5. Hence the reasoning of the decision in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) is not directly applicable to the question of standing under 14(e). Moreover,

many of the concerns expressed by the court in *Blue Chip* are inapposite to analysis of the 14(e) action. Most importantly, the possibility of a boundless class of nonpurchasing or nonselling plaintiffs seeking relief for violations of the securities laws does not exist under 14(e) as it might under 10b–5 absent a purchaser-seller limitation. The class of nontendering shareholders is limited to the persons actually confronted with the offer, that is, holders of target company stock at the time the offer was made.

Finally, as the courts and commentators have pointed out, nontendering shareholders are within the class for whose protection the Williams Act was specifically designed.[11] In sum, a nontendering shareholder injured by fraudulent misrepresentations in the course of a tender offer may, at least in the typical case where the shareholder relied upon those misrepresentations, sue for damages under section 14(e).

▄▄▄ What must be decided here, then, is the more precise and more difficult question whether a nontendering shareholder who was not misled by alleged misrepresentations in the course of a tender offer and who, consequently, did not rely on them, may nonetheless sue for injury caused by the successful completion of that tender offer.

It should be noted at the outset that the cases are at least facially inconsistent in their response to this question. Before considering those cases, however, it is important to add that where, as here, neither the statute nor the case law gives a final answer, this court's inquiry must be guided by the apparent scope and purpose of the Williams Act. As the Fifth Circuit wrote in *Sargent v. Genesco, supra* :

> In determining who has standing to sue under 14(e), the quest has been for what

---

11. *See* A. Bromberg, Securities Law: Fraud § 6.3 (1974):

> [T]he nontendering security holder may be in even greater need of protection than the one who tenders. In enacting 14(e), Congress showed as much concern for the nontenderor as for the tenderor, not only by

eliminating the "purchase or sale" phrase which 10b–5 uses, but in its discussion of the need for legislation. [citation deleted]. It follows that the nontendering security holder has standing under 14(e) even if he does not under 10b–5.

will best further the objective of the statute. 492 F.2d at 769.

In that regard, the reasoning of the Supreme Court in *Chris-Craft* is an essential guide to proper analysis of the issue presented.

The Hundahls' section 14(e) claim is atypical in two regards. First, the Hundahls did not rely upon, and were not fooled by the alleged misrepresentations in the tender offer materials. Second, the type of injury allegedly suffered—diminution in stock value due to Mutual's ownership of 80% of United stock—is, if not facially attenuated, an unusual one in the arena of securities fraud litigation. This second element might also be viewed as a matter of causation; that is, the alleged injury was a less direct result of the alleged misrepresentation than the typical injury suffered by a shareholder fraudulently induced to tender shares for an inadequate price. The question here is whether, in the light of *Chris-Craft* and other cases, and in the light of the Williams Act itself, the claim ought to be cognizable under section 14(e).

The court in *Chris-Craft* carefully set out the class of persons who were the intended beneficiaries of the Williams Act—namely, shareholders of the target company. Implicit in the court's language and reasoning is the concept that the Act was passed for the narrow purpose of insuring that shareholders confronted with a tender offer are afforded the benefit of full disclosure with regard to their decision to accept or refuse the offer. The court found that the establishment of a private damage remedy on behalf of tender offerors was not necessary to effectuate the limited purposes of the Act.

The plaintiffs here are not of the usual type of victims of nondisclosure for whose protection the Williams Act was fashioned. They were apparently aware of the alleged inadequacy of the price offered by Mutual for United shares, and so were not misled into tendering their shares. The person for whom the Act's protection was intended, however, is the target company shareholder who was misled (or, arguably, who is a member of a class that was misled) by omissions or misrepresentations in the course of a tender offer. The Hundahls do not fall within that class; hence to accord them standing under section 14(e) would be to expand the scope of an Act that the Supreme Court has indicated should receive a narrow construction.

It need not be decided here whether in the usual case a specific showing of reliance is a prerequisite to recovery under section 14(e).[12] Whatever may be the rule regarding plaintiffs whose reliance upon misstatements or omissions is at least an objective possibility, this court refuses to extend standing under section 14(e) to persons who clearly did *not* rely on alleged misstatements. Such persons already possessed at the time of the offer knowledge of the facts whose disclosure the Williams Act was designed to insure. Thus they had no need of the Act's protection, and they may not seek relief under it. To permit suit by such persons would broaden the scope of the Williams Act and would be out of harmony with *Chris-Craft*, which ascribed to the Act a narrowness of purpose.

When the question is approached from the vantage point of injury or causation rather than reliance, the same conclusion is reached. The injury that the Hundahls seek to redress under section 14(e) is, as noted above, not of the type at which the Williams Act was aimed. The Act was designed to prevent the injury suffered by a shareholder fraudulently induced to make an unwise response (tendering or not) to a tender offer. That injury typically will be easily measured as the difference between the price for which shares were tendered (or not tendered) and the "genuine" value of those shares. Such an injury is directly caused by misstatements in the tender offer materials.

---

12. *Compare Clayton v. Skelly Oil Co.*, 1977–1978 C.C.H.Fed.Sec.L.Rep. ¶ 96,269 (S.D.N.Y. 1977) *with Dupuy v. Dupuy*, 551 F.2d 1005 (5th Cir. 1977). *See also* 3 A. Bromberg, Securities Law: Fraud § 8.6(e) (1973).

The injury suffered here, however, is of a different character from that typically contemplated, and is a significantly less direct result of the alleged misstatements. The claimed injury flows directly, if at all, from the successful completion of the tender offer, and only indirectly from alleged misstatements in the tender offer materials. Viewed from this angle, too, to permit suit by these plaintiffs for monetary relief under section 14(e) would contravene at least the spirit of the *Chris-Craft* decision.

Moreover, establishment of a damage remedy on behalf of the plaintiffs here is not "necessary to effectuate Congress' goals." *Chris-Craft, supra*, 430 U.S. at 26, 97 S.Ct. 926. Certainly any complaint concerning misrepresentations in the tender offer here would most appropriately be made by persons who relied to their injury on the truth of what they were told. Creation of a remedy for monetary damages on behalf of such persons adequately effectuates the goals of the Williams Act; it is unnecessary to go further and to create a damages remedy on behalf of those not misled by the tender offer materials.

Furthermore, the *Chris-Craft* case cannot be read in isolation. It is part of a stream of decisions aimed at tightening the elements of actions under the antifraud provisions of the federal securities, a series that includes *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Ernst and Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); and *Santa Fe Industries v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1976). The force of those decisions, too, counsels against establishment of an action for damages under section 14(e) on behalf of the plaintiffs in this case.

In sum, the section 14(e) claim for monetary relief brought by the plaintiffs here does not fall within the sweep of section 14(e) as measured by the Supreme Court in *Chris-Craft*. This court is constrained to interpret the Williams Act with the same purpose ascribed to it by the Supreme Court. In that light, the claim for damages here is too remote in terms of reliance, causation, and injury from the intended reach of the Act to be cognizable under section 14(e). The motion for summary judgment with respect to the Williams Act claim is therefore GRANTED.

*Conclusion*

This case makes plain the exquisite difficulties for litigants caught in swirling eddies of "policy decisions." In many affairs and often decidedly so in the commercial word, predictability of judicial result has a value that rivals abstract correctness of result. Able managers can live with reasonably clear standards—but no player in the take-over game benefits from vague post-hoc guidelines. Unfortunately, it is uncertain where we are going; looking back from *Piper v. Chris-Craft Industries, Inc., supra* to *Kardon v. National Gypsum Co.*, 69 F.Supp. 512 (E.D.Pa.1946), the path from 1946 to 1977 is not plain. More pointedly even the path from *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) to *Chris-Craft* in 1977 is ill-defined. Judicial legislation of rights of action seems to be freighted with re-examination that painfully taxes the values of stare decisis. This is not a lamentation but an explanation to the litigants who must now move to another court for another view. Where we are is evident when it is recognized that in institutional terms it is not a matter of one court being "correct or incorrect;" it is only a matter of which court speaks last. Our persistence in using "error" to explain the process does not mask this reality.

The defendants' motion for summary judgment is GRANTED except as to the claim under Rule 10b–5 alleging nondisclosure with respect to dividend restriction.